UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**No. 24-10903-G**

_____

VIVIAN RUGGERI

*Appellee/Cross-Appellant*,

v.

NCL (Bahamas) LTD.,

*Appellant/Cross-Appellee.*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
No. 20-CV-21961-DPG
_____

**PRINCIPAL BRIEF OF APPELLANT/CROSS-APPELLEE
NCL (BAHAMAS) LTD.**

_____

Jack R. Reiter, FBN 0028304
jack.reiter@gray-robinson.com
Robert C. Weill, FBN 0009962
robert.weill@gray-robinson.com
GrayRobinson, P.A.
333 SE Second Avenue, Suite 3200
Miami, Florida 33131
T: (305) 416-6880; F: (305) 416-6887

*Counsel for Appellant/Cross-Appellee
NCL (Bahamas) Ltd.*

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. Rule 26.1-1, Appellant/Cross-Appellee NCL (Bahamas), Ltd., notifies the Court that the following persons and entities have an interest in the outcome of this appeal:

Fagenson, Rachael M., Esq., *Trial Counsel for Defendant/Appellant-Cross Appellee*

Foreman Friedman, P.A., *Trial Counsel for Defendant/Appellant-Cross Appellee*

Gayles, Darrin, *United States District Judge*

Goodman, Lisa, Esq., *Counsel for Plaintiff/Appellee-Cross Appellant*

GrayRobinson, P.A., *Appellate Counsel for Defendant/ Appellant-Cross Appellee*

Hickey, John, Esq., *Counsel for Plaintiff/Appellee-Cross Appellant*

Hickey Law Firm, *Counsel for Plaintiff/Appellee-Cross Appellant*

Marcotte, Daniel, Esq., *Trial Counsel for Defendant/Appellant-Cross Appellee*

McAlpin, Richard, Esq., *Trial Counsel for Defendant/Appellant-Cross Appellee*

McAlpin Conroy, P.A., *Counsel for Defendant/Appellant-Cross Appellee*

McAlpin Tanner Marcotte, *Trial Counsel for Defendant/Appellant-Cross Appellee*

NCL (Bahamas), Ltd., *Defendant/Appellant-Cross Appellee*

Reyes-Otazo, Alicia, *United States Magistrate Judge*

Ruggeri, Vivian, *Plaintiff/Appellee-Cross Appellant*

Street, Matthew, Esq., *Trial Counsel for Defendant/Appellant-Cross Appellee*

Parrish, Philip Dixon, Esq., *Counsel for Plaintiff/Appellee-Cross Appellant*

Philip D. Parrish, P.A., *Counsel for Plaintiff/Appellee-Cross Appellant*

Reiter, Jack, Esq., *Counsel for Defendant/Appellant-Cross Appellee*

Weill, Robert, Esq., *Counsel for Defendant/Appellant-Cross Appellee*

## CORPORATE DISCLOSURE STATEMENT

Norwegian is a wholly-owned subsidiary of NCL International, Ltd., a Bermuda company, which in turn is a wholly-owned subsidiary of Arrasas Limited, an Isle of Man company, which in turn is a wholly-owned subsidiary of NCL Corporation Ltd., a Bermuda company ("NCLC"). NCLC is subsidiary of Norwegian Cruise Line Holdings Ltd., a Bermuda company publicly traded on NASDAQ ("NCLH"). NCLH in turn is owned by: Star NCLC Holdings Ltd., a Bermuda company ("Genting HK"); one or more of one or more of AIF VI NCL (AIV), L.P., AIF VI NCL (AIV II), L.P., AIF VI NCL (AIV III), L.P., AIF VI NCL (AIV IV), L.P., AAA Guarantor — Co-Invest VI (B), L.P., Apollo Overseas Partners (Delaware) VI, L.P., Apollo Overseas Partners (Delaware 892) VI, L.P., Apollo Overseas Partners VI, L.P., Apollo Overseas Partners (Germany) VI, L.P., AAA Guarantor — Co-Invest VII, L.P., AIF VI Euro Holdings, L.P., AIF VII Euro Holdings, L.P., Apollo Alternative Assets, L.P., Apollo Management VI, L.P. and Apollo Management VII, L.P. (collectively, the "Apollo Funds"); one or more of TPG Viking, L.P., TPG Viking AIV I, L.P., TPG Viking AIV II, L.P., and TPG Viking AIV-III, L.P. (collectively, the "TPG Viking Funds"); and public shareholders. As of January 31, 2016, the relative ownership percentages of NCLH's ordinary shares were approximately: Genting HK (11.1%), Apollo Funds (15.8%), TPG Viking Funds (2.3%) and public shareholders (70.8%).

# STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument to address the legal issues presented in this appeal and to answer any questions about the factual and procedural history of this case.

# TABLE OF CONTENTS

                                                                    **Page**

CERTIFICATE OF INTERESTED PERSONS ....................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................C-3

STATEMENT REGARDING ORAL ARGUMENT ........................... i

TABLE OF CONTENTS ..........................................................ii

TABLE OF AUTHORITIES ......................................................iv

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES.....................................................2

STATEMENT OF THE CASE AND FACTS ........................................3

STANDARDS OF REVIEW .......................................................24

SUMMARY OF ARGUMENT ...................................................25

ARGUMENT .........................................................................27

   I.  THE DISTRICT COURT ERRED IN ALLOWING RUGGERI TO AMEND HER ALLEGATIONS AGAINST NCL AND TO CHANGE HER THEORY OF LIABILITY IN HER RESPONSE TO NCL'S MOTION FOR SUMMARY JUDGMENT ..........................................................27

   II.  THE DISTRICT COURT ERRED IN DENYING NCL'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE FAILURE-TO-WARN CLAIM BECAUSE NCL DISCHARGED ITS DUTY TO WARN BY PROVIDING FAIR AND ADEQUATE WARNINGS TO RUGGERI BEFORE SHE FELL ABOUT THE PRECISE CONDITION THAT CAUSED HER INJURIES ...........................................................31

III. THE DISTRICT COURT ERRED BY FAILING TO REMIT THE DAMAGES AWARD ......................................................................................35

A. The District Court Erred By Not Reducing the Award Based on the Limitation of Damages Clause in the Guest Ticket Contract .................35

  1. The Ticket Contract Satisfied the Physical Characteristics Prong ....36

  2. The Ticket Contract Satisfies the Extrinsic Factors Prong................40

B. The District Court Abused its Discretion in Not Remitting the Past Pain and Suffering Award Based on Its Findings that Ruggeri's Testimony Was Not Credible, that She Overstated the Severity of Her Pain, and Other Comparable Verdicts ...................................................................................43

CONCLUSION ........................................................................................................52

CERTIFICATE OF COMPLIANCE......................................................................53

CERTIFICATE OF SERVICE ..............................................................................53

**Cases**                                                                                    **Page(s)**

*Boone v. City of McDonough*,
  571 Fed. Appx. 746 (11th Cir. 2014) ..................................................................27

*Caron v. NCL (Bahamas), Ltd.*,
  910 F.3d 1359 (11th Cir. 2018) .......................................................................30

*Chaparro v. Carnival Corp.*,
  693 F.3d 1333 (11th Cir. 2012) .......................................................................31

*Cohen v. Carnival Corp.*,
  945 F. Supp. 2d 1351 (S.D. Fla. 2013) ...........................................................31

*Combs v. Plantation Patterns*,
  106 F.3d 1519 (11th Cir. 1997) .......................................................................24

*Davis v. Valsamis, Inc.*,
  752 Fed. Appx. 688 (11th Cir. 2018) ..............................................................35

*Euland v. M/V Dolphin IV*,
  685 F. Supp. 942 (D.S.C. 1988) .....................................................................37

*Everett v. Carnival Cruise Lines*,
  Inc., 912 F.2d 1355 (11th Cir. 1990) ..............................................................31

*Gilmour v. Gates, McDonald & Co.*,
  382 F.3d 1312 (11th Cir. 2004) .................................................................. 27, 30

*Gonzalez v. Cooper*,
  No. 05-2019-CA-044387, 2021 WL 6807814
  (Fla. 18th Cir. Ct. Dec. 2, 2021) ....................................................................48

*Hadlock v. Norwegian Cruise Line, Ltd.*,
  No. SACV10-0187, 2010 WL 1641275 (C.D. Cal. Apr. 19, 2010)....................41

*Hayes v. Royal Caribbean Cruises, Ltd.*,
  No. 1:18-CV-23756, 2019 WL 1338574 (S.D. Fla. Mar. 22, 2019)...................40

*Henson v. Seabourn Cruise Line, Ltd.*,
  410 F. Supp. 2d 1246 (S.D. Fla. 2005)............................................................36

**Cases**                                                                    **Page(s)**

*Higgs v. Costa Crociere S.p.A. Co.*,
   No. 15-cv-60280-JIC, 2016 Jury Verdicts LEXIS 1518
   (S.D. Fla. Mar. 4, 2016) ......................................................................50

*Higgs v. Costa Crociere S.p.A. Co.*,
   No. 15-cv-60280-JIC, 2018 Jury Verdicts LEXIS 35323
   (S.D. Fla. Sept. 27, 2018) ...................................................................50

*Johnson v. United States*,
   780 F.2d 902 (11th Cir. 1986) .............................................................43

*Keefe v. Bahama Cruise Line, Inc.*,
   867 F.2d 1318 (11th Cir. 1989) ...........................................................31

*Kelly v. Sheila Shine Inc.*,
   No. 13-2015-CA-009225, 2018 WL 3344673
   (Fla. 11th Cir. Ct. Apr. 13, 2018) .......................................................49

*Kermarec v. Compagnie Generale Transatlantique*,
   358 U.S. 625 (1959) .............................................................................31

*Lebedinsky v. MSC Cruises, S.A.*,
   789 Fed. Appx. 196 (11th Cir. 2019) ..................................................38

*Marek v. Marpan Two, Inc.*,
   817 F.2d 242 (3d Cir. 1987) ....................................................... 37, 39

*Maynor v. GEICO Gen. Ins. Co.*,
   No. 15-CA-001265, 2018 Jury Verdicts LEXIS 16199
   (Fla. 20th Cir. Ct. May 17, 2018) .......................................................49

*Moise v. Miami-Dade Cnty.*,
   No. 17-20993-CIV, 2018 WL 4445111 (S.D. Fla. Aug. 22, 2018) ....................27

*Montero v. Corzo*,
   No. 2017-000104-CA-01, 2019 Jury Verdicts LEXIS 84599
   (Fla. 11th Cir. Ct. Aug. 30, 2019) ......................................................49

# TABLE OF AUTHORITIES--CONTINUED

**Cases**                                                                    **Page(s)**

*Moore v. Appliance Direct, Inc.*,
  708 F.3d 1233 (11th Cir. 2013) ..........................................................24

*Paul v. Holland Am. Line, Inc.*,
  463 F. Supp. 2d 1203 (W.D. Wash. 2006) ..........................................39

*Rodriguez v. Farm Stores Grocery, Inc.*,
  518 F.3d 1259 (11th Cir. 2008) ..........................................................43

*Scott v. RPSS Holdings L.L.C.*,
  No. 50-2016-CA-010850, 2018 WL 8926551
  (Fla. 15th Cir. Ct. Oct. 12, 2018) ......................................................49

*Shankles v. Costa Armatori, S.P.A.*,
  722 F.2d 861 (1st Cir. 1983) ................................................. 36, 37, 40

*Wajnstat v. Oceania Cruises, Inc.*,
  No. 09-21850-CIV, 2011 WL 13099034 (S.D. Fla. July 12, 2011) ........ 24, 35, 39

*Wallis v. Princess Cruises, Inc.*,
  306 F.3d 827 (9th Cir. 2002) ................................................. 24, 35, 37

*Young v. City of Augusta, Ga.*,
  59 F.3d 1160 (11th Cir. 1995) ...........................................................24

**Statutes**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1332 ...................................................................................1

28 U.S.C. § 1333 ...................................................................................1

46 U.S.C. § 30527 ...............................................................................36

**Rules**

Fed. R. Civ. P. 15(a) ...........................................................................27

# JURISDICTIONAL STATEMENT

This district court possessed subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeded $75,000 and was between citizens of different States and/or citizens of a State and a citizen of a foreign state. *See* DE 1 ¶¶ 1, 2, 3, 4. The district court also possessed subject-matter jurisdiction under 28 U.S.C. § 1333 because this is a civil case of admiralty or maritime jurisdiction. *Id.* ¶ 4.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the district court rendered a final decision. *See* DE 179.

This appeal was timely. The final judgment was filed on December 18, 2023, and NCL filed a timely Rule 59 motion. DE 159, 166. The district court denied the Rule 59 motion on February 23, 2024. DE 177. The district court filed an amended final judgment on March 5, 2024, and NCL filed its notice of appeal on March 22, 2023. DE 185.

This is an appeal from a final judgment that disposes of all parties' claims. *See* DE 179.

## **STATEMENT OF THE ISSUES**

1.  Whether the district court erred in denying NCL's motion for summary judgment on the failure-to-warn claims relating to dangerous sea conditions and bad weather when it was undisputed on the day of the alleged incident that the sea was calm, and the weather was normal.

2.  Whether NCL discharged its duty to warn by providing Plaintiff with multiple warnings about the risks of riding in a tender boat before the alleged incident including the very risk that caused Plaintiff's injuries.

3.  Whether the district court abused its discretion in failing to remit the award based on the limitation clause in the Guest Ticket Contract when it was clearly visible and not ambiguous and in failing to remit the past pain and suffering award of $800,000 as being excessive when the district court found that Plaintiff's testimony about her pain and recovery was not credible and did not award her any damages for her future pain and suffering.

# STATEMENT OF THE CASE AND FACTS

**Introduction**

This appeal arises from a final judgment in favor of Plaintiff Vivian Ruggeri, a passenger on the Norwegian Cruise Line ship *Epic*, who sustained shoulder injuries while riding in a tender boat returning to the *Epic* from Cannes, France. Ruggeri alleged that her injuries occurred when the tender collided with a dock platform in rough seas and bad weather conditions that were endemic to the area, and that NCL breached its duty to warn Ruggeri of those conditions. NCL moved for summary judgment because discovery revealed that on the day of the incident the seas were calm and the weather was normal and that it did not cause the incident. The district court allowed Ruggeri to replead her theory of liability in her response to the motion, contending for the first time that NCL's negligent operation of the tender vessel created a wake that caused the tender to roll or pitch.

NCL repeatedly warned Ruggeri of the risks of riding in a tender boat before she boarded the tender and while she was in the tender before the incident. The district court found that those warnings were inadequate and that NCL should have also warned Ruggeri again in the twenty-five seconds when the pitching began.

After the bench trial where the district court found NCL liable, the district court observed the extensive inconsistencies between Ruggeri's testimony and other evidence in the case about her pain and recovery and found her not credible. It

awarded her nothing for her future pain and suffering based on her lack of credibility but awarded her $800,000 for her past pain and suffering. The district court denied NCL's post-trial motion to remit this award as well as the total award based on the limitation of damages provision in the Guest Ticket Contract (a.k.a. The Athens Convention) finding that the provision was not reasonably communicated to Ruggeri.

## A.    Statement of the Facts

Ruggeri was a passenger aboard the NCL *Epic* during a seven-day western Mediterranean cruise when the incident occurred. DE 86-20. Ruggeri's alleged injuries occurred while the *Epic* was at the tender port in Cannes, France. DE 1 ¶¶ 7, 10; DE 7 ¶¶ 7, 10. She was sixty-three years old at the time with a life expectancy at trial of an additional 18.88 years. DE 85-22 at 1; DE 194 at 12; DE 84-14. Ruggeri suffered from multiple pre-existing medical conditions and had been a smoker for forty years. DE 195 at 95-96; DE 87-23 at 1; DE 87-24 at 1. Ruggeri was not new to cruising or to the operation or layout of tender boats; she had taken six cruises in the three previous years and the incident occurred after three previous trips on a tender vessel in the Cannes. DE 195 at 5, 121; DE 87-15 at 18; DE 85-2.

### 1.    The Alleged Incident

On Friday, October 25, 2019, Ruggeri and her husband rode the tender in the morning to shop in Cannes. DE 194 at 31-32; DE 195 at 120-21. They rode the tender

again in the afternoon to go on an excursion. DE 194 at 31. At approximately 5:30 p.m., Ruggeri and her husband boarded a tender vessel to return to the *Epic*.[1] DE 194 at 33; DE 83-1 at 1. At the time of the incident, the tender vessel was full or "almost full" of passengers. DE 192 at 178; DE 194 at 35; DE 195 at 140, 155.

Approximately twenty minutes before the incident, the *Epic's* log book recorded the wind speed at three knots and sea conditions as "Smooth." DE 85-14 at 51. At the time of the incident, the sea conditions were "calm" and the water was "flat." DE 195 at 5; DE 201-1 at 4-5; *see also* DE 85-29 [Jt. Ex. 27-13] (video). Ruggeri's marine expert, Capt. Keijer, characterized the conditions as "smooth as a mirror," "glassy," and "could not have been more perfect" with "excellent" visibility. DE 192 at 69, 71.

Ruggeri sat port-side forward on the first row of bench seats, facing aft with her back to the tender operator; her husband sat to her left, closer to the aisle. DE 194 at 36, 38, 39, 57; DE 196 at 12. Ruggeri "estimate[d]" that the tender was operated at "almost twice the speed of the other three tender [trips]" she had taken that day. DE 195 at 5. She claimed that she injured her right shoulder when she fell forward and grabbed the underside of a perpendicular bench after the tender "slowed down abruptly" and started rolling; she denied that the tender's impact with the

---

[1] The tender vessel was 56 feet long and approximately 19 feet wide and can carry up to 230 passengers. DE 192 at 85, 177.

*Epic's* floating platform injured her. *Id.* at 150-51; DE 194 at 42-43, 44, 45. She did not hear any warnings before the tender "crashed" into the dock. DE 194 at 42, 43; DE 196 at 114-16. She experienced immediate 9/10 pain in her right arm. DE 196 at 12. She claimed that "[t]here were blood curdling screams" by "everybody" on the tender and "worried about [the tender] capsizing" because the rocking was so "extreme" and "violent." *Id.* at 106; DE 194 at 43. The tender vessel embarkation video does not show the 200-plus disembarking passengers screaming and yelling or looking terrified. DE 85-29 [Jt. Exs. 29-09, 29-10].

Ruggeri did not immediately report the incident to the tender boat crew, the medical center, or to any other crewmembers. DE 81-1 at 2; DE 195 at 125-26; DE 196 at 17-18, 20. Despite testifying that she experienced immediate and continuous pain in her shoulder, Ruggeri waited over twenty-four hours to report her injuries and there were no known witnesses to the incident. DE 194 at 47, 48; DE 196 at 16, 24-25; DE 83-1 at 2.

Ruggeri's written statement the day after the incident stated that the tender pilot "misjudged and the tender boat hit the dock." DE 83-1 at 1. She did not reference any "abrupt slow-down," the panic and screaming on-board, her sliding on the bench, or the "extreme" rocking of the boat. DE 196 at 25. The statement was written in legible cursive with her injured right arm. *Id.* at 24-25; DE 195 at 7.

Ruggeri's husband's written statement of the incident was not consistent with her version of the events. He claimed that the tender "slammed the side of the ship," that he caught his wife as she was falling, and that his wife "banged her shoulder." *See* DE 83-4 at 1; DE 194 at 58-59 (Ruggeri denying that she fell); *id.* at 59 (denying that she banged her shoulder).[2]

There was no evidence that any other passengers were injured in the incident and no passengers complained about the operation of the tender vessel or about the pilot's failure to warn them about the alleged rolling of the vessel. DE 198 at 169-70. Neither the tender vessel nor the tender platform sustained any damage in the incident. *Id.* at 172, 187.

## 2. NCL's Pre-Incident Warnings About Tendering

Ruggeri's theory at trial was that NCL should have provided a separate warning to her on board the tender boat in the twenty-five second period when the allegedly dangerous condition appeared. NCL's theory, on the other hand, was that the multiple warnings provided to Ruggeri before the incident about the risks of tendering discharged its duty to warn. The three warnings are described below.

NCL first plays a fifteen-minute video continuously on the safety channel of the televisions in the cabins on embarkation day. *See* DE 198 at 153. Ruggeri

---

[2] Based on the husband's statement and other characterizations of the incident, NCL believed that Ruggeri was standing when she was injured. The district court found no "competent" evidence to support NCL's belief. DE 199 at 105.

watched this video. DE 195 at 129-31. The video contains an introduction to tendering and warns passengers: "Even in calm seas or while docked in port, the ship can move suddenly, or the wind can change direction unexpectedly." DE 86-2 [Jt. Ex. 32-1 (video)]; DE 132-1 at 4-5 [Jt. Comp. Ex. 32A.4-.5 (transcript)].

NCL plays a tender-specific safety video in the cabins the day before a tender port and all day in the tender port. DE 198 at 154; DE 195 at 131-32. The day before the ship docked in Cannes, NCL played this special tendering video in the cabins on the safety channel which Ruggeri viewed. *See* DE 195 at 131, 132. This video, which warns passengers of sudden movement of tenders, especially when coming alongside, states, in pertinent part:

> Remember the tender may be moving much more than the ship.
>     . . . .
>
> Always remember we will only tender when it is safe to do so and tenders, even the big ones, are much smaller than the ship and will be much more likely to move around, especially if the wind rises or the sea develops a swell.
>
>     . . . .
>
> If there is a sudden movement, like a boat passing by and causing a wake, then crew may ask you to wait until things settle down before allowing you to embark. If this is the case, please be patient and follow the instructions.
>
>     . . . .
>
> Although the tender may not be moving, remember that motion could only be a small wave away, so always take care when going to your seat and be sure to hold on to the handrails, poles or seat backs.

8

. . . .

> The tender can move unexpectedly when it is maneuvering or coming alongside, so please do not be tempted to stand up as the tender is approaching the dock or the ship as it may come to a sudden stop.

> . . . .

> Please be careful and remember the tender can still move even in the calmest harbor due to traffic, so when moving from the tender to the dock remember to keep those hands free.

DE 86-2 [Jt. Ex. 32-3 (video)]; DE 132-1 at 7-9 [Jt. Comp. Ex. 32A.7-9 (transcript)].

NCL plays a 48-second audio recording in the tender vessel whenever a tender leaves either the port dock or the ship. DE 198 at 154; DE 201-3 at 18, 38-39. The warning audio states:

> Please be seated at all times when the tender is moving. Do not stand up and disembark until the tender is safely moored. When disembarking the tender please be aware of the motion of the tender compared to the jetty or tender platform.

DE 86-2 [Jt. Ex. 32-4 (video)]; DE 132-1 at 11 (transcript). Before the alleged incident, Ruggeri would have heard the audio recording four times when the ship was in Cannes. DE 198 at 154. Ruggeri could not recall hearing this warning. DE 195 at 122.

### 3. Post-Incident Events and Ruggeri's Medical Treatment

After the alleged incident, Ruggeri proceeded with her vacation, disembarking at the remaining port-of-calls on October 26, October 27, and October 29. DE 85-2;

DE 196 at 39. Her normal shipboard routine also continued without impact. DE 195 at 119-20. She went to dinner in the dining rooms, gambled in the casino, attended the nightly entertainment, sat on the pool deck, and shopped and disembarked at the other three ports of call where she took excursions. *Id.* at 10, 11, 119-20, 153; DE 194 at 47, 48; DE 196 at 20-21, 22, 39. She and her husband even purchased excursions after the alleged incident. DE 85-1 at 1; DE 196 at 48-49; *but see* DE 196 at 48-49, 130 (denying that she went on the excursion in Naples, Italy).

When Ruggeri disembarked in Mallorca, Spain on October 26, she rode a bus on a city tour for about three hours. DE 194 at 49; DE 196 at 22. She then returned to the *Epic* and then was seen at the ship's medical center around 6 p.m. DE 194 at 49; DE 88-6 at 1. Ruggeri reported that she injured her right shoulder and an x-ray revealed no fractures. DE 194 at 49; DE 88-6 at 1, 4. She was diagnosed with a sprained shoulder, prescribed an over-the-counter anti-inflammatory, and was given a sling. DE 193 at 138; DE 194 at 49; DE 88-6 at 5. Ruggeri returned to the medical center two days later on October 28, 2019, and was given medicine to alleviate her subjective complaints of pain which she only took a "couple of times." DE 193 at 139-40; DE 195 at 9.

After the cruise, Ruggeri spent an extra day in Rome to sightsee and eat dinner out. DE 196 at 50. She waited fifteen days to seek medical care and, by then, had already contacted a lawyer. DE 88-4 at 1; DE 193 at 140; DE 196 at 50. She first

saw Dr. William Law of Rothman Orthopaedics who also diagnosed her with a sprain and ordered physical therapy. DE 193 at 141; DE 195 at 12; DE 196 at 52. She attended only three or four of the twelve ordered therapy sessions and canceled or "no-showed" the rest. DE 88-1 at 6; DE 193 at 142; DE 196 at 53-56.

Ruggeri then switched to Dr. Kenneth Chern of Seaview Orthopaedic & Medical Associates who ordered additional physical therapy and administered a shoulder injection. DE 193 at 143; DE 195 at 12; DE 196 at 61; DE 87-29 at 10. On December 26, 2019, three months after disembarking and failing to attend physical therapy, Ruggeri got her first MRI of her right shoulder which the radiologist read as a *partial* rotator cuff tear. DE 88-24 at 1; DE 193 at 48; DE 195 at 19. Ruggeri previously had a non-traumatic right shoulder rotator cuff tear in 2007 which also required surgical repair. DE 193 at 30, 121; DE 195 at 92.

On March 17, 2020, Ruggeri underwent an arthroscopic rotator cuff repair surgery. DE 88-14 at 1-3; DE 193 at 172. Nine days after the surgery, Ruggeri's pain was "manageable" and she was not taking any pain medication. DE 196 at 69; DE 87-29 at 123. In follow up visits in April, May, and September of 2020, following physical therapy, Ruggeri was "doing very well" with minimal or no pain and good range of motion. DE 87-29 at 149-50, 181-82, 225-26, 227; *see also* DE 193 at 176-77 (Ruggeri's IME expert characterizing her elevation range of motion in September 2020 as "great" and other ranges of motion as "good"). During this time, she was

teaching her normal real estate classes, driving to real estate properties to inspect, appraise, and list them, cooking meals at home, visiting her grandchildren, and doing laundry and other household chores. DE 194 at 21; DE 195 at 40, 41; DE 196 at 67, 72. She also went on two seven-day cruises in October 2020 and February 2021. DE 196 at 72.

In March 2021, after six months without treatment or follow up, Ruggeri complained of new pain. DE 87-29 at 227-28; DE 193 at 74-75, 179-80. On April 30, 2021, she underwent another MRI that showed a recurrent rotator cuff tear and progression of her right shoulder arthritis from mild/moderate to severe. DE 88-13 at 1-2; DE 89-4 at 1-2; DE 193 at 75, 86, 181. On June 11, 2021, Ruggeri underwent a reverse total shoulder replacement surgery – an outpatient procedure. DE 88-15 at 2-3; DE 193 at 184; DE 88-9 at 13; DE 195 at 49; DE 196 at 74. She was prescribed pain medicine and took them "maybe twice." DE 195 at 52. Within a few days, she was back at work and after thirteen days she was experiencing little or no pain and was driving. DE 196 at 75, 77; DE 87-29 at 324. In October 2021 and February 2022, she went on two weeklong cruises. DE 196 at 81-82; DE 87-29 at 475.

As of July 14, 2022, about a year post-surgery, Ruggeri was "happy with her result," had full strength in her shoulder without pain, had good range of motion, and had no restrictions. DE 87-29 at 482; DE 196 at 83; DE 193 at 185, 187, 188; *see also id.* at 186 (Ruggeri's expert describing some of her range of motion as

"unnaturally good"). She was instructed to follow-up with her doctor within the year and did not do so. DE 87-29 at 483; DE 193 at 188; DE 196 at 83. Her office visit in July 2022 was the last time she sought medical treatment for her shoulder. DE 87-29 at 482-83; DE 193 at 188-89; DE 196 at 87. She went on cruises in October 2022 and February 2023 (two weeks). DE 196 at 87.

## B.    Statement of the Case

Ruggeri alleged three negligent failure-to-warn claims against NCL: negligent failure to warn (Count I), DE 1 at 10 ¶ 33; negligent training of personnel regarding their duty to warn of dangerous sea conditions (Count II), DE 1 at 16 ¶ 49; and negligent supervision of personnel regarding their duty to warn about dangerous sea conditions (Count III), DE 1 at 21 ¶ 66. Each count was predicated on NCL's failure to warn her about "rough sea conditions" and dangerous weather in port in Cannes, France. DE 1 ¶¶ 10, 12, 14, 15, 17, 23, 27, 28, 29, 33, 40, 41, 45, 46, 57, 62, 63. She did not plead negligent operation of the tender vessel and did not allege that the tender operator created the dangerous condition.

NCL denied liability. DE 7 at 3 ¶ 33; *id.* at 4 ¶ 49; *id.* at 5 ¶ 66. NCL raised as an affirmative defense that "it fully discharged its duties to Plaintiff by warning of any and all dangerous or hazardous conditions, if any." DE 7 at 7. It also noted that its liability for damages was limited by the Athens Convention which was

incorporated into Ruggeri's Guest Ticket Contract. *See* DE 7 at 6, 10 (2nd and 20th affirmative defenses).

## 1. Discovery

Discovery in this case was centered around the dangerous weather conditions, not the operation of the tender vessel. DE 107 at 10. On October 26, 2020, NCL produced to Ruggeri a video of the tender shortly before the incident and CCTV footage. Both showed calm seas and normal weather conditions. DE 107 at 8, 9, 32; DE 85-29 [Jt. Exs. 29-01, 29-13]. NCL also produced a deck log that confirmed the smooth and calm seas and good weather conditions. DE 107 at 8, 9; DE 85-14 at 51. After receipt of this evidence, Ruggeri did not amend her Complaint to change her theory of liability. The first time that NCL learned that Ruggeri had changed her liability theory – *i.e.*, that the negligent operation of the tender vessel caused a wake which caused the tender to roll — was the second week of August 2022, after fact discovery was closed, when Ruggeri disclosed her expert's report. DE 107 at 10; *see* DE 83-25 at 2 (expert report).

## 2. NCL's Motion for Summary Judgment

On December 28, 2022, NCL moved for summary judgment on the three failure-to-warn claims which were predicated on historically dangerous *sea* and *weather* conditions in the port of Cannes. DE 29. NCL argued that there were no dangerous sea conditions on the date of the alleged incident. *Id.* at 3, 6. In response,

Ruggeri retreated from her Complaint's allegations about the historically rough seas and bad weather in the port of Cannes, and instead claimed that operation of the tender vessel created the dangerous condition—*i.e.*, the tender vessel's abrupt slowdown and turn to starboard caused a wake wave to roll the tender—and that NCL failed to warn of *this* dangerous condition. DE 39 at 3, 16; DE 107 at 21-22. The district court denied the motion for summary judgment. DE 104; *see also* DE 107 at 35-36. It found that "a reasonable person [could] understand that [Ruggeri was] challenging the tender operator's operation of the tender." DE 107 at 36. Accordingly, the district court found that there were issues of fact "with regard to whether the tender operator reasonably operated the vessel under the circumstances" and "what caused . . . the general conditions at the time of the accident." DE 107 at 35-36. The district court and the parties later agreed that these issues were irrelevant to Ruggeri's new theory of liability. *See, e.g.,* DE 115; DE 192 at 72, 98-99; DE 199 at 52.

### 3. Trial

Before trial, NCL moved in limine to prohibit Ruggeri from presenting evidence at trial regarding the negligent operation, maintenance, or design of the tender vessel because it was not pled. DE 65; *see also* DE 66 (response); DE 69 (reply). The district court denied the motion. DE 105; DE 107 at 37. In denying NCL's Rule 60(b) motion regarding the summary judgment order, the district court

also allowed Ruggeri to "present evidence regarding the operation of the tender vessel," but prohibited any recovery on a negligent operation claim. DE 115.

The district court conducted a bench trial from November 6, 2023 through November 9, 2023 and December 4, 2023 through December 7, 2023. The case went to trial on the three failure-to-warn claims alleged in the Complaint. *Id.*

### a.   Plaintiff Ruggeri's Case

Ruggeri's case-in-chief consisted of five witnesses: (1) Jomar Buerano, the tender vessel operator;[3] (2) Brett Berman, NCL's corporate representative; (3) Capt. Hendrik Keijer, Ruggeri's marine expert; (4) Dr. Richard Rozencwaig, Ruggeri's expert orthopedic surgeon; and (5) herself. Ruggeri did not call her husband to corroborate her version of the incident despite previewing his testimony in her opening statement. DE 192 at 20-21; DE 194 at 5-6.

Capt. Henrik Keijer explained that the failure-to-warn claim was based on the tender operator's approach to the platform at an initial high speed (5.53 knots or 6.36 mph), followed by an "abrupt" slowdown to three knots (3.45 mph) and turn to starboard. DE 192 at 67-68, 76, 94. The "abrupt" slow down allegedly created a wake and the starboard turn allowed the wake to cause the tender to roll twenty-five seconds before the tender impacted the platform. *Id.* at 67-68, 87. There is no posted

---

[3] Ruggeri also read portions of Mr. Buerano's video deposition during NCL's case-in-chief. *See* DE 197 at 112 *et seq.*

speed limit for tenders outside the Cannes port; NCL imposes a speed limit of ten knots. *Id.* at 173, 175. 227. Capt. Keijer's opinion that the tender was operated at an excessive speed was not based on any guidelines, rules, or regulations. *Id.* at 187-88.

Capt. Keijer estimated the roll to be approximately ten degrees to port and nine degrees to starboard which "would be unreasonable . . . in these sea conditions." DE 192 at 101-02, 104, 105. Within those twenty-five seconds, he believed that the tender operator "had ample time to grab the PA system" to warn the passengers "that they should take preventative measures to minimize their injuries that could potentially occur or to deal with this emergency situation." *Id.* at 69, 87-88; *see also id.* at 113-14, 115-16, 200. Specifically, Capt. Keijer opined that the tender operator should have warned: "Brace yourselves. Hold on to your seats. There is going to be rolling. It may be excessive rolling or we are about to collide with the platform." *Id.* at 203.

Capt. Keijer conceded that NCL's warning in the safety video "does address roll, that guests could expect the vessel to roll in any moment," and the "possibility of an unexpected vessel movement" but found it "insufficient" because the warning should have been repeated when the actual dangerous condition arose. DE 192 at 118, 119, 203-04.

On cross-examination, Capt. Keijer did not find any "fault" in NCL's warnings in the tender-specific video before the incident and found them to be "good," "appropriate" and a "good idea." *Id.* at 141-52, 207. He conceded that to issue a warning on the tender's P.A. system, the tender operator would have had to divert his attention from piloting the vessel. *Id.* at 171-72; *see also* DE 85-17 at 13. On redirect, Capt. Keijer testified that the pilot's helper could have issued the warning. DE 192 at 229.

### b.    Rule 52(c) Motion

At the close of Ruggeri's case, NCL moved for partial findings under Rule 52. DE 196 at 141. After hearing argument, *see id.* at 141-73, the district court entered a directed verdict in favor of NCL on Ruggeri's negligent supervision failure-to-warn claim (Count 3). *Id.* at 173; DE 199 at 112.

### c.    NCL's Case

NCL's case-in-chief consisted of five witnesses: (1) Dr. Jan Pieter Hommen, NCL's board-certified orthopedic surgical expert; (2) Jomar Buerano; (3) Nina Lopez-Llamozas, the clinical medical assistant for Dr. Hommen;[4] (4) Capt. John Harestad, NCL's marine expert; and (5) Brett Berman, NCL's corporate representative.

---

[4] Ms. Llopez-Llamozas was called to refute Ruggeri's charge that Dr. Hommen did not physically examine her during his IME.

NCL's theory was that the wake was caused by other boats in the area or an unexpected ocean swell and that its pre-incident warnings about the risks of tendering discharged its duty to warn Ruggeri again in the twenty-five seconds when the tender began pitching. DE 72 at 2-3. NCL also contended that Ruggeri's alleged injuries were not caused by the subject incident but, rather, were the result of a pre-existing rotator cuff pathology and pre-existing degenerative conditions. *Id.* at 3; DE 194 at 89-90, 122, 230. NCL also contended that Ruggeri failed to mitigate her damages by continuing to smoke after her injury and surgeries. DE 72 at 3.

### i.  Jomar Buerano

Mr. Buerano did not recall this incident. DE 201-3 at 25-26, 31. In reviewing the CCTV footage, he testified that he would not have operated the tender differently. *Id.* at 29, 35. He believed his approach to the dock was proper and that an unexpected swell came quickly that caused the tender to roll. *Id.* at 28-29, 37. He had operated a tender in over 400 transits in Cannes, France without a single complaint, incident, or injury. *Id.* at 36-37; DE 198 at 6-7, 127; *accord id.* at 167; DE 192 at 164-65.

### ii.  Capt. John Harestad

Capt. Harestad found NCL's pre-incident warnings "sufficient" and that no additional warnings were needed. DE 198 at 15-19, 21-22. He opined that NCL properly warned its passengers of sudden and unpredictable movement of tender

vessels while in transit. *Id.* at 22-24. While he believed that the tender operator "could" have warned the tender passengers within the twenty-five seconds when it began pitching, it would have required him to divert his focus from the controls and the maneuvering of the vessel alongside the platform. *Id.* at 89-90. He also found it would have been "impractical" for the operator's mate to make the warning because it would have interfered with the operator's use of controls and his visibility and distracted him. *Id.* at 90, 100, 131.

After viewing the CCTV footage, Capt. Harestad opined that the tender vessel did not "abruptly slow down" and that the tender reduced speed normally. DE 198 at 26-27, 82. He also could not conclusively determine the source of the water disturbance but ruled out the tender itself. *Id.* at 28, 35-36. Any number of factors could have contributed to the disturbance including a wake from the tender vessel, vessel traffic in the area, and/or a sea swell. *Id.* at 85. The tender vessel creates a wake "to some degree" every time it is operated "under any circumstances, anywhere, anyplace." *Id.* at 87-88. He did not see a "dangerous situation" at any point in the CCTV footage and opined that the tender's speed as it approached the platform was not excessive. *Id.* at 31, 33-34, 36-37, 89, 133. He, however, admitted that the tender made a "hard landing" which was minimized by the tender fenders. *Id.* at 38, 39, 50, 89.

After the defense rested, Ruggeri offered no evidence in rebuttal. *Id.* at 221.

### d. Motions for Judgment as a Matter of Law

After the close of evidence, Ruggeri moved for judgment as a matter of law on NCL's comparative negligence defense and on the applicability of the limitation of damages provision. DE 199 at 4-6. NCL moved for partial findings under Rule 52(c) based on insufficiency of evidence. *Id.* at 6. The parties incorporated argument on both motions into their closing arguments. DE 198 at 221.

During closing arguments, the district court pointedly asked Ruggeri's counsel "why are the video warnings not sufficient?" DE 199 at 9. The district court also asked Ruggeri's counsel how it should consider Ruggeri's discrepancies:

> It seems that there were discrepancies between the plaintiff's description of events, her own injury, the severity of her pain that differed from others, including the people that treated her, the people she selected to treat her, therapists and the physicians.
>
> There is a discrepancy on whether or not she was seeking counsel early or not.
>
> One such event could have been a mistake but so many discrepancies between her version and other people.

DE 199 at 27; *see also id.* at 95 (court questioning "[w]hy one would complain of pain at a level of 10 out of 10 and then go on a cruise?"). Relatedly, the district court asked Ruggeri's counsel how Ruggeri's refusal to take narcotics to alleviate her pain should factor into assessing the pain and suffering award. *Id.* at 30.

### e. Judgment and Post-Trial Motions

Following closing arguments, the district court delivered the following three

rulings in open court: (1) There was sufficient evidence on the failure-to-warn claim (Count 1), but not on the failure to train to warn claim (Count 2), DE 199 at 103-04, 108; (2) Ruggeri's injuries were caused by the incident and she was not comparatively negligent by standing at the time of the incident, *id.* at 105-06; and (3) The limitation provision in the Guest Ticket Contract was unenforceable. *Id.* at 110-11.

The district court entered judgment in favor of Ruggeri on the negligent failure to warn as follows:

| | | |
|---|---|---|
| Past Medical Expenses | : | $35,441.99 |
| Future Medical Expenses | : | $18,360.00 |
| **Total Economic Damage**s | : | **$53,801.99** |
| | | |
| Past Non-Economic Damages | : | **$800.000.00** |
| Prejudgment Interest | : | **$162,968.55** |
| **TOTAL** | : | **$1,016,770.54** |

DE 159 at 1 ¶¶ 1, 2, 3; *id.* at 2 ¶ 4; DE 199 at 109-10. The district court did not award Ruggeri future non-economic damages based on the "many contradictions between [Ruggeri's] testimony and people who have no incentive to lie." DE 159 at ¶ 3; DE 199 at 109.

Ruggeri moved to award future non-economic damages or for reconsideration of the denial of future non-economic damages. DE 164; DE 173 (response); DE 174 (reply). The district court denied the motion reiterating "that Plaintiff's trial testimony about her pain and suffering was not entirely credible." *See* DE 176.

NCL moved for entry of judgment as a matter of law and, alternatively, argued that the award should be remitted pursuant to the limitations provision and that the $800,000 award of past pain and suffering should also be remitted because it was excessive. DE 166; DE 172 (response); DE 175 (reply). Specifically, NCL argued, among other things, that Ruggeri failed to prove her failure-to-warn claim because the dangerous condition on which she based her claim occurred a mere twenty-five seconds before the accident and NCL discharged its duty to warn. DE 166. The district court denied the motion. DE 177.

On March 5, 2024, the district court entered an amended final judgment which included an award of prevailing party costs of $12,496.39[5] for a total judgment of $1,029,266.93. DE 179 at 2 ¶ 5. NCL appealed and Ruggeri cross-appealed the order denying her motion for an award of future non-economic damages. DE 185, 186.

---

[5] Ruggeri sought $12,941.84 in taxable costs, *see* DE 162 at 5 ¶ 9, and NCL argued that only $4,547.50 should be awarded. DE 163 at 7.

# STANDARDS OF REVIEW

**I.**     This Court reviews the denial of NCL's motion for summary judgment *de novo*, applying the same legal standards employed by the district court. *Young v. City of Augusta, Ga.*, 59 F.3d 1160, 1170 (11th Cir. 1995).

**II.**     This Court reviews *de novo* the denial of a Rule 59(e) motion for judgment as a matter of law. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).

**III.A.** Because the issue of whether a carrier reasonably communicated a limitation of damages to a passenger is a question of law for the court to decide, this Court reviews a decision refusing to enforce such a limitation *de novo*. *Wallis v. Princess Cruises, Inc.,* 306 F.3d 827, 835 (9th Cir. 2002); *Wajnstat v. Oceania Cruises, Inc.*, No. 09-21850-CIV, 2011 WL 13099034, at *3 (S.D. Fla. July 12, 2011).

**III.B.** This Court reviews the denial of a motion for remittitur under an abuse of discretion standard. *Moore v. Appliance Direct, Inc.*, 708 F.3d 1233, 1237 (11th Cir. 2013).

# SUMMARY OF ARGUMENT

The district court erred in denying NCL's motion for summary judgment on the three failure-to-warn claims. As pled, this case was about NCL's failure to warn Ruggeri about dangerous sea conditions and bad weather allegedly endemic to the port of Cannes, France. Discovery revealed that on the day of incident the sea was calm and the weather was normal. Nevertheless, the district court erroneously allowed Ruggeri to "re-plead" her case by changing her theory of liability and the factual basis for her failure-to-warn claims through her response to the motion for summary judgment and without seeking leave to amend her Complaint.

The district court erred in denying NCL's motion for judgment as a matter of law on the failure-to-warn claim. NCL discharged its duty to warn Ruggeri by providing multiple warnings to her before the incident about the risks of tendering, including about the unexpected movement of tenders and a roll in any moment — the precise danger that caused Ruggeri's injury.

The district court erred in failing to reduce the damages on two alternate grounds. First, the district court erred by not enforcing the limitation of damages clause in the Guest Ticket Contract when it was it was clearly visible and contained unambiguous language, and Ruggeri had unlimited opportunities to review the provision. Second, the district court abused its discretion by not remitting the past pain and suffering award of $800,000 when it awarded nothing for Ruggeri's future

pain and suffering based its findings that she overstated the severity of her pain and expressly ruled that her testimony was not credible.

This Court should reverse the amended final judgment and remand for entry of judgment in favor of NCL. Alternatively, this Court should reduce the total award based on the limitation clause to $534,644.00 or remit the past pain and suffering award to $50,000 in line with comparable cases.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN ALLOWING RUGGERI TO AMEND HER ALLEGATIONS AGAINST NCL AND TO CHANGE HER THEORY OF LIABILITY IN HER RESPONSE TO NCL'S MOTION FOR SUMMARY JUDGMENT

It is well-settled that a plaintiff may not amend a complaint though argument in a brief opposing summary judgment; instead, a plaintiff seeking to assert a new claim must amend the complaint pursuant to Federal Rule of Civil Procedure 15(a). *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *see also Boone v. City of McDonough*, 571 Fed. Appx. 746, 750-51 (11th Cir. 2014). "Federal courts also routinely hold that a plaintiff may not assert a new theory supporting an existing claim in response to a motion for summary judgment." *Moise v. Miami-Dade Cnty.*, No. 17-20993-CIV, 2018 WL 4445111, at *12 (S.D. Fla. Aug. 22, 2018) (rejecting plaintiff's impermissible assertion of new facts and theories because they were brought for the first time in response to defendant's motion for summary judgment). Additionally, the liberal pleading standards under Rule 8(a) are inapplicable after discovery has commenced and "[l]iberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint." *Gilmour*, 382 F.3d at 1315.

NCL moved for summary judgment on all three failure-to-warn claims which were predicated on the existence of historically dangerous *sea* and *weather* conditions in the port of Cannes, France. *See* DE 1 ¶¶ 10, 12, 14, 15, 17, 23, 27, 28,

29, 33, 40, 41, 45, 46, 57, 62, 63. The time for amending the pleadings had expired nine months earlier and fact discovery had been closed for five months. DE 23 at 1. NCL argued the record, which included Ruggeri's own deposition testimony, showed that there were no unreasonably dangerous sea conditions on the date of the alleged incident. DE 29 at 3, 6.

In response, Ruggeri retreated from the Complaint's allegations and revised her theory of liability; she now claimed that negligent operation of the tender vessel caused a wake to roll the tender and that NCL failed to warn of *this* wake. DE 39 at 3, 16; DE 107 at 21-22. At the hearing on the motion and after observing the video, the district court agreed that "the water seemed to be relatively calm until the approach." DE 107 at 7; *see also id.* at 13 ("the sea appeared to be pretty calm from the video"). NCL argued that it was prejudiced by Ruggeri's failure to allege this new theory because it may have retained a different expert who could opine the operation of the vessel and the new failure to warn theory. DE 107 at 13-14; *see also id.* at 32-33 (discussing additional discovery it would have undertaken). Ruggeri's counsel conceded that this new theory was not revealed to NCL until about two years into the litigation when her expert filed his report. DE 107 at 22.

Nevertheless, the district court denied NCL's motion, *see* DE 104; *see also* DE 107 at 35-36, finding that "a reasonable person [could] understand that [Ruggeri was] challenging the tender operator's operation of the tender." DE 107 at 36. The

district court faulted NCL for not asking for more time to conduct additional discovery, opting instead to file a *Daubert* motion challenging Ruggeri's expert. *Id.* at 37. The district court denied NCL's subsequent Rule 60(b) motion to set aside the order denying summary judgment, *see* DE 109; DE 111 (response); DE 114 (reply), and allowed evidence of this new negligent operation theory at trial. DE 115. To ameliorate the prejudice resulting from allowing Ruggeri to plead a new theory of liability, NCL moved for leave to designate an additional liability expert. DE 110; DE 112 (response); DE 113 (reply). NCL explained that its expert was only retained to opine on the alleged failure-to-warn claims, not on whether a tender vessel can create a wake as claimed by Ruggeri. DE 110 at 3 ¶¶ 6, 9. The district court denied the motion stating:

> At this stage of the litigation, the Court does not find good cause to permit additional discovery or to designate an additional liability expert. A liberal reading of Plaintiff's Complaint shows that one of her theories of liability was based on the tender operator's operation of the tender vessel. Moreover, Defendant has been long aware of Plaintiff's expert's opinion about the tender operator's actions; however, Defendant did not seek leave to conduct additional discovery or designate a new expert.

DE 116.

The district court erred in allowing Ruggeri to amend her complaint in response to NCL's motion for summary judgment. Based on the unrefuted evidence of calm seas and good weather conditions at the time of the incident, there was no basis for imposing liability against NCL on the failure to warn of historically

dangerous sea and weather conditions. Instead, the district court allowed Ruggeri to avoid summary judgment and shift the entire focus of the case from a failure to warn about endemic sea and weather conditions to conditions created by the allegedly negligent operation of the tender vessel. The district court also erred in liberally reading the Complaint to infer that her new theory was pled. *See Gilmour*, 382 F.3d at 1315. The district court compounded the prejudice by not allowing NCL to retain an additional expert.

Most importantly, the Guest Ticket Contract barred Ruggeri from raising this new claim or changing the factual basis of her failure-to-warn claims to support a different claim. *See* DE 85-13 at 7 ¶ 10(a) ("[N]o suit shall be maintainable unless commenced within one (1) year from the day of the incident giving rise to such injury, illness or death, notwithstanding any provision of law of any state or country to the contrary."). In *Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359 (11th Cir. 2018), this Court found that the same language "unambiguously bars a passenger from raising new claims in an amended complaint more than a year after an incident." *Id.* at 1367. This Court also found that "[i]t would likewise be nonsensical for this provision to permit the passenger to provide the factual basis of his claim to NCL before filing suit but then later change the factual basis to support a different claim." *Id.*

The new claims also would not relate back because they "involve[ ] separate and distinct conduct," (*i.e.*, negligent operation of the tender creating a wake) such that the Ruggeri would have to prove "completely different facts" than required to recover on the claims in the original complaint. *Id.* at 368. Accordingly, the district court erred in allowing Ruggeri to avoid summary judgment by allowing her to informally amend her Complaint in response to the motion for summary judgment. This Court should remand for entry of summary judgment in favor of NCL.

## II. THE DISTRICT COURT ERRED IN DENYING NCL'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE FAILURE-TO-WARN CLAIM BECAUSE NCL DISCHARGED ITS DUTY TO WARN BY PROVIDING FAIR AND ADEQUATE WARNINGS TO RUGGERI BEFORE SHE FELL ABOUT THE PRECISE CONDITION THAT CAUSED HER INJURIES

Ruggeri's claims are governed by general maritime law, *see Keefe v. Bahama Cruise Line, Inc.,* 867 F.2d 1318 (11th Cir. 1989), but "[i]n analyzing a maritime tort case, [this Court can] rely on general principles of negligence law." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (internal quotations omitted). Cruise ship operators, like NCL, owe its passengers the duty to exercise reasonable care under the circumstances. *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 630 (1959); *Everett v. Carnival Cruise Lines, Inc.,* 912 F.2d 1355, 1358 (11th Cir. 1990). This duty includes a duty to warn passengers of dangers of which the carrier knows or should, but which may not be apparent to a reasonable passenger. *Cohen v. Carnival Corp.,* 945 F. Supp. 2d 1351, 1357 (S.D. Fla. 2013).

NCL repeatedly warned Ruggeri about the risks of tendering, and these warnings should have been deemed adequate as a matter of law to discharge NCL's duty to warn. NCL played two safety videos – one upon embarkation at port (Video #1) and another the day before and during tendering at a tender port (Video #2) – and a third audio warning on the tender itself ("Audio Warning"). *See* **Video #1**: DE 86-2 [Jt. Ex. 32-1 (video)]; DE 132-1 at 4-5 (transcript); **Video #2**: DE 86-2 [Jt. Ex. 32-3 (video)]; DE 132-1 at 7-9 (transcript); **Audio Warning**: DE 86-2 [Jt. Ex. 32-4 (recording)]; DE 132-1 at 11 (transcript).

Video #1 provided the following relevant warnings about sudden movements of vessels on the open seas: **"Even in calm seas or while docked in port, the ship can move suddenly, or the wind can change direction unexpectedly."** DE 86-2 [Jt. Ex. 32-1]; DE 132-1 at 4-5 (transcript)] (emphasis added).

Video #2, which focused on tendering safety, provided the following warnings:

- **Remember the tender may be moving much more than the ship.**

- **[T]enders, even the big ones, are much smaller than the ship and will be much more likely to move around, especially if the wind rises or the sea develops a swell.**

- **If there is a sudden movement, like a boat passing by and causing a wake**, then crew may ask you to wait until things settle down before allowing you to embark.

- **Although the tender may not be moving, remember that motion could only be a small wave away, so** always take care when going

to your seat and **be sure to hold on to the handrails, poles or seat backs**.

- **The tender can move unexpectedly when it is maneuvering or coming alongside** . . . .

- **Please be careful and remember the tender can still move even in the calmest harbor due to traffic, so when moving from the tender to the dock remember to keep those hands free.**

DE 86-2 [Jt. Ex. 32-3 (video)]; DE 132-1 at 7-9 (transcript) (emphasis added).

Ruggeri's theory at trial was that she was injured when the tender allegedly "abruptly" slowed down and created a wake that caused the tender to roll twenty-five seconds before the tender impacted the dock platform. DE 192 at 67-68, 87. At trial, Ruggeri's marine expert did not find any "fault" in NCL's warnings before the incident and found them "good," "appropriate" and a "good idea." *Id.* at 141-52, 207. He admitted that Ruggeri had been warned of the precise danger that caused her injury – the "possibility of an unexpected vessel movement," including a "roll in any moment." *Id.* at 118, 204. Her expert opined, however, that another warning should have been given in those twenty-five seconds. *Id.* at 200, 206. Because NCL warned Ruggeri about the precise danger that caused her injury, this Court should find that NCL's pre-incident warnings were sufficient as a matter of law and discharged NCL's duty to warn.

Moreover, it was not reasonable under the circumstances to have required the tender pilot to have issued another warning within the twenty-five seconds that the

allegedly dangerous condition arose. While both marine experts agreed that a warning was possible, it would have further endangered the safety of the tender passengers. Ruggeri's marine expert conceded that to issue a warning on the tender's P.A. system, the tender operator would have had to divert his attention from piloting the vessel. DE 192 at 171-72; *see also* DE 85-17 at 13. NCL's expert agreed – he testified that to have issued a warning it would have required him to divert his focus from the controls and the maneuvering of the vessel alongside the platform. DE 198 at 89-90. While Ruggeri's marine expert also testified that the pilot's helper could have issued the warning, *see* DE 192 at 229, it would have interfered with the pilot's use of the controls and his visibility and distracted him. DE 198 at 90, 100, 131.

The standard for evaluating whether NCL met its standard of care is reasonableness. As a matter of law, NCL acted reasonably by issuing multiple warnings to its passengers regarding the risk at issue. It would be patently unreasonable to conclude that NCL failed to fulfill its duty by not issuing yet another warning in the seconds before the incident. The Court should reverse the final judgment and remand for entry of judgment for NCL as a matter of law.

## III. THE DISTRICT COURT ERRED BY FAILING TO REMIT THE DAMAGES AWARD

### A. The District Court Erred By Not Reducing the Award Based on the Limitation of Damages Clause in the Guest Ticket Contract

If this Court does not enter judgment for NCL, then it should apply the limitation clause in the Guest Ticket Contract (hereinafter "Contract") to reduce the amount of the amended judgment.

General federal maritime law governs cruise line passage contracts. *Davis v. Valsamis, Inc.,* 752 Fed. Appx. 688, 691 (11th Cir. 2018). "Maritime contracts must be construed like any other contracts: by their terms and consistent with the intent of the parties." *Id.* at 691-92 (internal quotations omitted). The Athens Convention is an international maritime treaty that, when applicable, limits a carrier's maximum potential liability to 400,000 Special Drawing Rights.[6] *See* EU Regulation 392/2009, Art. 7. Because the United States has not ratified the Athens Convention, it carries no force of law on its own. *See Wallis*, 306 F.3d at 839. However, a contract that incorporates the Athens Convention may be enforceable as a term of a valid contract. *Id.* A court may enforce such a limitation provision only when a cruise ship embarks

---

[6] The International Monetary Fund defines SDRs as a unit of account. The monetary value of SDRs is determined by converting them into the national currency of the court where judgment is rendered. *Wajnstat*, 2011 WL 13099034, at *2 n.2. When the district court entered final judgment on December 18, 2023, 400,000 SDR equaled $534,644.00. *See* https://www.imf.org/external/np/fin/data/rms_sdrv.aspx.

from and disembarks in a foreign port with an entirely foreign itinerary. *Henson v. Seabourn Cruise Line, Ltd.*, 410 F. Supp. 2d 1246, 1248 (S.D. Fla. 2005); *see also* 46 U.S.C. § 30527. It was undisputed that the *Epic* never embarked from, nor disembarked in, a U.S. port, nor did its itinerary ever include a U.S. port. *See* DE 198 at 188; DE 192 at 24; DE 195 at 116-17; DE 86-20 at 2; DE 196 at 37-38. Thus, the limitation provision met the threshold for application.

A limitations provision is binding where the contract "reasonably communicate[s] to the passenger the existence therein of important terms and conditions which affect legal rights." *Shankles v. Costa Armatori, S.P.A.*, 722 F.2d 861, 864 (1st Cir. 1983). To determine whether a carrier reasonably communicated a limitation of liability provision to a passenger, a court must analyze "the overall circumstances on a case-by-case basis." *Id.* at 866. Where, as here, a contract clause is non-negotiated, courts employ a two-prong "reasonable communicativeness" test to determine whether the clause is fundamentally fair. *See id.* at 864. The two prongs examine: (1) the physical characteristics of the contract, and (2) any extrinsic factors indicating the passenger's ability to become meaningfully informed of the contractual terms at issue. *Id.* at 864, 866.

### 1.    The Ticket Contract Satisfied the Physical Characteristics Prong

The district court erred by finding that the Ticket was "deficient" under this prong because "it was not as detailed in some of the cases [where] those limitations

had bold print, as well as caps [and] [t]here is nothing here otherwise to make it stand out." DE 199 at 110-11. As discussed below, the district court should not have used other cases as a benchmark when the analysis should be on a "case-by-case" basis. *See Shankles*, 722 F.2d at 866. The limitations clause in the Contract satisfied the physical characteristics prong of the reasonable communicativeness test because it was clearly set out and contained clear language.

Under this first prong, a court examines the physical characteristics of the contract, including "[f]eatures such as size of type, conspicuousness and clarity of notice on the face of the ticket, and the ease with which a passenger can read the provisions in question." *Id.* at 864.; *accord Wallis*, 306 F.3d at 835. The reasonable communicativeness test does not impose on the cruise line the duty to design the "best" ticket, or to give an "ideal" warning. *Euland v. M/V Dolphin IV*, 685 F. Supp. 942, 946 (D.S.C. 1988). As the Third Circuit has noted, "[t]here is no situation where, from hindsight, one could not imagine the shipowner doing some little bit more to draw attention to the limitation clause. . . . Thus, even though the courts continue to use the 'all it reasonably could' language, application of the standard involves notions of reasonableness and not hypothesizing some further step the shipowner could possibly have taken." *Marek v. Marpan Two, Inc.*, 817 F.2d 242, 245 (3d Cir. 1987). To satisfy this prong, "it is enough that the [clause] was clearly

set out and contained clear language." *Lebedinsky v. MSC Cruises, S.A.,* 789 Fed. Appx. 196, 200 (11th Cir. 2019).

The top of the first page of the Contract which contains a notice labeled in bold and capital letters, "Important Notice," and which is surrounded by a box, states:

> **IMPORTANT NOTICE:** Guests are advised to carefully read the terms and conditions of the Guest Ticket Contract set forth below which affect your legal rights and are binding. The Guest's attention is specifically directed to Paragraphs 10 and 14 of the Terms and Conditions of the Guest Ticket Contract. Acceptance or use of this Contract shall constituted the agreement of Guest to these Terms and Conditions.

*See* DE 85-13 at 1. This language alerts the passenger to the existence of provisions that affect the passenger's legal rights and advises the passenger to "carefully read [all of the] terms and conditions." *Id.*

Although the limitation provision (¶ 5) begins on page three of the contract, the provision is clearly labeled in bold ("**Limitations and Disclaimers of Liability**"). *Cf. Lebedinsky,* 789 Fed. Appx. at 200 (finding that forum selection clause satisfied the physical characteristics prong although it appeared on page 128 of a cruise line's "obviously lengthy booklet"). The plain-English heading is also separate and distinct from the rest of the text and clearly defines the section as pertaining to "Limitations," an indirect reference to the "Important Notice" paragraph's reference to "terms and conditions . . . which affect your legal rights."

Paragraph five is also not any harder to find or read than any of the other provisions in the contract, and, once it is located and read, it is easily understood. There is also no requirement that a limitation provision be the first clause of a ticket contract before it is legally enforceable. *Marek*, 817 F.2d at 247.

Moreover, although the "Important Notice" clause and the limitation clause appear in small type, the font size is exactly the same, not smaller, than every other provision in the Contract. *See Wajnstat*, 2011 WL 13099034, at *4. Similarly, both clauses are clearly printed and easily read, even when held at arms' length distance from the naked eye. *See Marek*, 817 F.2d at 246. Additionally, all the terms and conditions are single-spaced, including the notice on the first page. In short, the limitation provision was not less conspicuous than any other term or condition, was not buried in fine print or camouflaged, was not printed over images and watermarks, and was not relegated to a footnote.

The fact that the "Important Notice" provision "specifically directed" the passenger to paragraphs ten and fourteen, and not paragraph five, does not make paragraph five less conspicuous. *See Marek*, 817 F.2d at 246 (stating that "no case stands for the proposition that a warning is legally insufficient unless it includes explicit references naming each of the contractual terms or conditions having the potential to affect the legal rights of passengers"); *Paul v. Holland Am. Line, Inc.*, 463 F. Supp. 2d 1203, 1207 (W.D. Wash. 2006) (upholding limitation in ticket

contract when the provision was in paragraph 14 in small type and the "important notice" warning advises the passenger that certain provisions limit her or her legal rights).

In light of the physical characteristics of the notice at the beginning of the passenger ticket contract and the physical characteristics of the limitation provision itself, this Court should find that NCL's limitation provision was sufficiently and reasonably conspicuous.

### 2. The Ticket Contract Satisfies the Extrinsic Factors Prong

The district court did not find that the Contract failed to satisfy this prong. *See* DE 199 at 110-11. Under this prong, a court considers "extrinsic factors" regarding whether "the circumstances surrounding the passenger's purchase and subsequent retention of the ticket/contract" permitted the passenger "to become meaningfully informed of the contractual terms at stake." *Shankles,* 722 F.2d at 865, 866. This prong "concerns not whether Plaintiff read the contract, but whether [she] had the opportunity to do so." *Hayes v. Royal Caribbean Cruises, Ltd.,* No. 1:18-CV-23756, 2019 WL 1338574, at *2 (S.D. Fla. Mar. 22, 2019). A court must consider the passenger's familiarity with the ticket, the time and incentive under the circumstances to study the provisions of the ticket, and any other notice that the passenger received. *Shankles*, 722 F.2d at 866.

In this case, Ruggeri had unlimited opportunities to review the Contract but declined to do so. DE 194 at 28; DE 195 at 114, 115-16. When Ruggeri booked her cruise, her purchase confirmation contained a link to the Contract. DE 86-20 at 2; DE 198 at 182-83. The Contract could be reviewed at any time at www.ncl.com. *See* DE 86-20 at 2. During online check-in for the cruise, Ruggeri checked a box saying that she read and agreed to the Contract. DE 198 at 184, 185; DE 195 at 115-16. *See Hadlock v. Norwegian Cruise Line, Ltd.*, No. SACV10-0187, 2010 WL 1641275, at *5 (C.D. Cal. Apr. 19, 2010) (finding passenger's electronic acceptance of the contract "important" because he "was forced by computer to agree to the terms and conditions").

The limitation provision in the Contract states:

> On international cruises which neither embark, disembark nor call at any U.S. port and where the Guest commences the cruise by embarkation or disembarks at the end of the Cruise in a port of a European Member State, Carrier shall be entitled to any and all liability limitations and immunities for loss of or damage to luggage, death and/or personal injury as provided under EU Regulation 392/2009 on the liability of carriers to guests in the event of accidents. Unless the loss or damage was caused by a shipping incident, which is defined as a shipwreck, capsizing, collision or stranding of the ship, explosion or fire in the ship, or defect in the ship (as defined by the Regulation), Carrier's liability is limited to no more than 400,000 Special Drawing Rights ("SDR") per guest (approximately U.S. $608,000, which fluctuates depending on the daily exchange rate as published in the *Wall Street Journal)* if the guest proves that the incident was a result of Carrier's fault or neglect. If the loss or damage was caused by a shipping incident, Carrier's liability is limited to no more than 250,000 SDRs per guest (approximately U.S. $380,000, which fluctuates depending on the daily exchange rate as published in the *Wall Street*

*Journal).* Compensation for loss caused by a shipping incident can increase to a maximum of 400,000 SDRs per guest unless Carrier proves that the shipping incident occurred without Carrier's fault or neglect. Shipping incidents do not include acts of war, hostilities, civil war, insurrection, natural disasters, or intentional acts or omissions of third parties. In cases where the loss or damage was caused in connection with war or terrorism, Carrier's liability for any personal injury or death (whether occurring during a shipping incident or a non-shipping incident) is limited to the lower of 250,000 SDRs per guest or 340 million SDRs per ship per incident. Punitive damages are not recoverable for cruises covered by EU Regulation 392/2009. For a copy of EU Regulation 392/2009, visit http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2009:131:0024:0046:EN:PDF. In addition, Guests embarking a cruise in a European Member State port are afforded rights under EU Regulation 1177/2010. For additional information on EU Regulation 392/2009 please click here, and for information regarding EU Regulation 1177/2010 please click here.

DE 85-13 at 4 ¶ 5(c) [Jt. Ex. 13.004].

This provision satisfied the extrinsic factors prong because it explains: the essential provisions of EU Regulation 392/2009; when the limitation applies; and its impact on NCL's liability to Ruggeri. Ruggeri could determine from the provision that the limitation applied to her cruise because her cruise embarked and disembarked in EU member countries as provided in her booking confirmation. *See* DE 86-20 at 2. The Contract also defined the conditions when each of its limitations applied, including the amount of damages that may be recovered (even converting to approximate U.S. dollars).The provision also provides a link to the full regulation for Ruggeri to further educate herself about other terms or to corroborate the provision's terms.

Based on the foregoing, if this Court does not enter judgment in favor of NCL it should reduce the amended final judgment to $534,644.00.

**B.** **The District Court Abused its Discretion in Not Remitting the Past Pain and Suffering Award Based on Its Findings that Ruggeri's Testimony Was Not Credible, that She Overstated the Severity of Her Pain, and Other Comparable Verdicts**

A remittitur order reducing an award "to the outer limit of the proof is the appropriate remedy where the [] damage award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc.,* 518 F.3d 1259, 1266 (11th Cir. 2008) (internal citation omitted). Excessiveness may be tested by comparing the verdict to those damage awards determined not to be excessive in similar cases. *Johnson v. United States,* 780 F.2d 902, 908 (11th Cir. 1986).

The district court found that Ruggeri was "overstating her injury, pain and post-surgery recovery." DE 199 at 108. It found that Ruggeri's testimony about "her recovery and pain levels don't make sense in light of her other actions" and that because "there are so many contradictions between her testimony and people who have no incentive to lie," her testimony "seemed incredible." *Id.* at 109. Finally, the district court "question[ed] the severity of the Plaintiff's pain and some of the other claims she has made regarding her recovery." *Id.* Specifically, the district court noted that Ruggeri maintained her tenuous testimony even in the face of evidence to the contrary. *Id.* at 108. The district court referenced her testimony regarding the "configuration of the tender seats, what she told her own her own physicians and her

own therapists regarding her recovery and pain levels that don't make sense in light of some of her other actions"; her "ability to do her own hair, which conflicts with the notes made by the therapist"; and her failure to recall the excursion in Naples, Italy. *Id.* at 108-09. The Court continued:

> I mean, if it had been one or two of these things, I mean, I probably wouldn't find them to be significant, but there are so many contradictions between her testimony and people who have no incentive to lie. And I understand, you know, when things are reported people are writing things down but the cumulative effect of that, it does make me question the severity of the plaintiff's pain and some of the other claims she has made regarding her recovery.

*Id.* at 109.

The district court's findings only scratched the surface of Ruggeri's inconsistencies at trial. As shown below, her inconsistencies permeated every aspect of the trial including the severity of the tender's rolling, how the incident occurred, her medical history, her physical capabilities, and her pain levels:

| Ruggeri's Testimony | Contradictory Evidence |
|---|---|
| She denied ever riding a cruise ship's tender vessel before the subject cruise. DE 195 at 105-06. | She rode cruise ship tenders at least three times before the subject cruise. DE 195 at 108-10. |
| The tender benches on which she and her husband sat were the only benches that did not have seatbacks or cushions. DE 195 at 136, 137, 138, 148. She denied that the layout depicted in the photos was accurate and denied her injury occurred on tender boat #5. DE | NCL's investigation confirmed the incident occurred on tender boat #5. DE 85-18 at 1; DE 198 at 179. The tender pilot confirmed that the incident occurred on tender boat #5 by viewing the CCTV footage. DE 201-3 at 31. |

| Ruggeri's Testimony | Contradictory Evidence |
|---|---|
| 194 at 37, 38, 40; DE 195 at 134, 138; DE 196 at 10. | There was no evidence that the inside of the tender was anything different than depicted in the photographs which showed seatbacks and cushions. DE 86-1 at 13; DE 87-12; DE 85-21.<br><br>There was no evidence that NCL ever modified the tender vessels after the incident. DE 198 at 162. |
| She denied "feeling" her husband reach out to help her as she was sliding on the tender bench.  DE 196 at 12-13. | Her husband "caught her" as she was falling. DE 196 at 29-30; DE 83-4 at 1. |
| There was "blood-curdling" screaming by "everyone" inside the tender during the incident. DE 194 at 43. | The video of tender passengers disembarking is unremarkable. DE 85-29 [Jt. Exs. 29-09, 29-10]. |
| She had immediate pain after the incident which continued until she reported to the ship's medical facility. DE 196 at 27. | She reported to the medical facility complaining about the *recent* onset of pain in her right arm. DE 196 at 26; DE 85-6 at 1. |
| She completed a medical form two days after the alleged injury with her left hand because she could not write with her "swollen" right hand. DE 195 at 8; DE 85-5 at 1; DE 196 at 41. | Ruggeri's medical examination did not show any swelling in her right hand. DE 85-6 at 9; DE 196 at 42-44. |
| She denied any significant medical history on her second trip to the medical center and to the first physician she saw after the cruise. DE 196 at 44, 51, 57, 58; DE 85-5 at 1; DE 88-4 at 1. | She had rotator cuff surgery in 2007 on the same shoulder. DE 193 at 30, 121; DE 195 at 92. |

| Ruggeri's Testimony | Contradictory Evidence |
|---|---|
| The first doctor she saw after the cruise, Dr. Law, told her to get a lawyer. DE 195 at 12-13; DE 196 at 51-52. | Dr. Law's medical record states that "she ha[d] already contacted a lawyer." DE 88-4 at 1. |
| Her "persistent" and "excruciating" pain was a 10/10 on February 20, 2020. DE 87-29 at 73; DE 195 at 34. | She went on a seven-day cruise two days later and did not receive any medical or physical therapy treatment on the cruise. DE 87-15 at 18; DE 195 at 103; DE 196 at 66. |
| Dr. Chern told her that she sustained a tear of the rotator cuff. DE 196 at 60. | Dr. Chern's report states that Ruggeri strained her right rotator cuff and *did not* tear her rotator cuff. DE 196 at 60; DE 87-29 at 9. |
| There was never a time when she was completely pain-free. DE 195 at 36. | On September 20, 2020, six months after her rotator cuff repair, Dr. Chern reported: "She has no pain in her right shoulder." DE 87-29 at 225. |
| She did not have full or good strength about a year after her shoulder replacement surgery. DE 196 at 83-34. | Dr. Chern documented that her strength was "about 5/5 without pain." DE 196 at 83-84; DE 87-29 at 482. |
| Following her shoulder replacement, she was never pain-free; her pain "diminished" in August or September 2022. DE 195 at 57. | She experienced no pain on external rotation on July 14, 2022. DE 87-29 at 482; DE 196 at 85. |
| She denied that Dr. Hommen, NCL's IME physician, examined her and claimed that his assistant questioned her about her history before Dr. Hommen entered the exam room. DE 195 at 62; DE 196 at 88-89, 125. | Dr. Hommen's assistant "document[s] everything that happens" during an IME in "real time" and confirmed that Dr. Hommen performed a physical examination, and, as has always been the practice, she never asked Ruggeri any questions, and entered the exam room *with* Dr. Hommen. DE 197 at 11, 12, 15-16, 18, 19, 21-22, 34; *see also* |

| Ruggeri's Testimony | Contradictory Evidence |
|---|---|
| | DE 148-1 (real time dictated notes of assistant). Dr. Hommen testified that he examined Ruggeri and always enters the room with his assistant. DE 197 at 66-67, 79. |
| On May 23, 2022, she had a good range of motion when she was examined by Dr. Rozencwaig. DE 193 at 194. On July 14, 2022, her range of motion was "unnaturally good" in her right shoulder. *Id.* at 185-86; DE 88-25 at 5. | When Dr. Hommen examined Ruggeri on May 24, 2022, her range of motion was "limited" and drastically lower than when Dr. Rozencwaig examined her the day before and two months later. Because of guarding, Dr. Hommen could not perform many standard tests. DE 197 at 51-54; DE 148-1 at 2; DE 199 at 61. |
| She gained about 30 or 40 pounds since the incident. DE 195 at 70. | She lost four pounds from date of incident to July 14, 2022. *Compare* DE 88-4 at 1 (185 lbs.) *with* DE 87-29 at 482 (181 lbs.); DE 196 at 94. |
| She cannot unlatch a necklace and cannot do her hair anymore. DE 195 at 79; DE 196 at 77. | She has been able to put her necklace on since September 2, 2021, *see* DE 87-29 at 394; DE 196 at 79, and she has able to do her hair since August 16, 2021. *See* DE 87-29 at 375; DE 196 at 78. |
| She was not told by Dr. Chern to return in one year. DE 196 at 86. | Dr. Chern told her to return in about a year unless she has a problem before then. DE 196 at 86; DE 87-29 at 482. |
| She began smoking at 16 but has smoked intermittently since then. *Id.* at 90. | Other than a gap of ten years, she has smoked ever since she was 16. DE 196 at 90-91. |

Despite the district court's findings and Ruggeri's extensive inconsistencies, the district awarded Ruggeri a staggering $800,000.00 for past pain and suffering.[7] As basis for this award, the district court cited to the two surgeries (both of which were outpatient and did not require overnight stays) and the "significant" (99) physical therapy sessions. DE 199 at 109. The district court did not provide any basis for its calculations. *See id.* For the reasons discussed below, the evidence did not support such an excessive award.

First, counsel for NCL has been unable to find any reported case in Florida or under maritime law with an award of $800,000 for past pain and suffering for similar damages (torn rotator cuff and shoulder replacement), involving a plaintiff whom the factfinder disbelieved because he or she exaggerated her pain and recovery. Even in the cases which do not appear to involve credibility issues for the plaintiff and involve analogous or more severe injuries, juries have awarded significantly less. *See, e.g.*, *Gonzalez v. Cooper*, No. 05-2019-CA-044387, 2021 WL 6807814 (Fla. 18th Cir. Ct. Dec. 2, 2021) (jury awarded plaintiff $123,000 for past pain and suffering [3 yrs.] for rear-end collision when plaintiff claimed permanent injuries including intervertebral disc disorder, lumbar radiculopathy, cervical and lumbar stenosis, cervical facet joint syndrome, right shoulder labral tear, rotator cuff sprain,

---

[7] This was for almost four years from the date of the incident, October 25, 2019, to the start of trial on November 6, 2023.

shoulder arthroscopy, lumbar fusion, and concussion), *reversed in part on other grounds*, 374 So. 3d 841 (Fla. 5th DCA 2023); *Montero v. Corzo,* No. 2017-000104-CA-01, 2019 Jury Verdicts LEXIS 84599 (Fla. 11th Cir. Ct. Aug. 30, 2019) (jury awarded plaintiff $30,000 in past pain and suffering [45 mos.] as a result of a car accident that caused a right rotator cuff tear, and bilateral meniscus tears in her knees; plaintiff underwent arthroscopic knee surgery), *rev'd on other grounds,* 320 So. 3d 976 (Fla. 3d DCA 2021); *Maynor v. GEICO Gen. Ins. Co.,* No. 15-CA-001265, 2018 Jury Verdicts LEXIS 16199 (Fla. 20th Cir. Ct. May 17, 2018) (jury awarded $125,000 for past pain and suffering [43 mos.] to plaintiff who underwent surgery to repair a rotator cuff tear, sustained a cartilage tear in her right wrist, and suffered from back, and neurological pain and complications); *Scott v. RPSS Holdings L.L.C.*, No. 50-2016-CA-010850, 2018 WL 8926551 (Fla. 15th Cir. Ct. Oct. 12, 2018) (jury awarded slip-and-fall plaintiff $150,000 for past pain and suffering [33 mos.] for neck injuries with radiculopathy, requiring a left hemilaminotomy and foraminotomy, as well as a fractured left wrist and a left shoulder rotator cuff tear); *Kelly v. Sheila Shine Inc.*, No. 13-2015-CA-009225, 2018 WL 3344673 (Fla. 11th Cir. Ct. Apr. 13, 2018) (jury awarded plaintiff who fell on defendant's property $25,000 for past pain and suffering [50 mos.] for injuries to the medial meniscus and cartilage in his right knee and a rotator cuff tear in his left

shoulder, requiring surgery and resulting in 18% whole body impairment, as well as a left arm laceration, neck injuries and right knee bruising).

The jury award in *Higgs v. Costa Crociere S.p.A.*, which involved a more serious injury, is illustrative. In that case, plaintiff suffered a displaced proximal humerus fracture, dislocated humerus head, torn left rotator cuff, and torn left bicep tendon when she tripped and fell on a cleaning bucket on a cruise ship. Plaintiff underwent open reduction internal fixation surgery with plate and twelve screws implanted, arthroscopic surgery to repair her rotator cuff, and had sutures to repair her torn bicep tendons. She additionally underwent six months of physical therapy, twice a week and received three cortisone injections in her shoulder. The case was tried twice in 2016 and 2018, and the jury awarded past pain and suffering of only $500,000 and $650,000, respectively. *See Higgs v. Costa Crociere S.p.A. Co.,* No. 15-cv-60280-JIC, 2016 Jury Verdicts LEXIS 1518 (S.D. Fla. Mar. 4, 2016) ("*Higgs I*"); *id.*, 2018 Jury Verdicts LEXIS 35323 (S.D. Fla. Sept. 27, 2018) ("*Higgs II*"). Critically, there was no finding in either *Higgs I* or *Higgs II* that the plaintiff was exaggerating the severity of her pain and recovery.

Even Ruggeri could not locate a jury verdict awarding even close to $800,000 for similar injuries. In support of her motion for additur, Ruggeri cited to three different cases whose juries only awarded $500,000 for past pain and suffering — almost 40% less than the district court's award to Ruggeri for her past pain and

suffering. *See* DE 164 at 19 (citing cases). In her response to NCL's motion for remittitur, Ruggeri did not cite any analogous cases to justify the district court's sizable award. *See* DE 172 at 10-12.

Finally, the district court acknowledged that Ruggeri's continuous smoking could have affected her recovery, DE 199 at 107, which was unrefuted at trial, but the district court did not consider this failure to mitigate in awarding past pain and suffering. *See* DE 193 at 118-21, 129 (Ruggeri's IME physician testifying that smoking negatively impacts healing after a rotator cuff repair surgery); *id.* at 182-83 (same acknowledging that it was possible that Ruggeri did not mitigate her condition by her continued smoking after her surgery in 2019).

In sum, given the district court's findings and other jury verdicts and Ruggeri's failure to mitigate, the $800,000 award for past pain and suffering is unconscionable and should be reduced to $50,000 as suggested at trial. *See* DE 199 at 82.

## CONCLUSION

This Court should remand for entry of final judgment in favor of NCL based on the erroneous denial of is motion for summary judgment. Alternatively, this Court should remand for entry of final judgment in favor of NCL because NCL discharged its duty to warn.

If this Court does not enter judgment for NCL, it should reduce the amended final judgment to $534,644.00 based on the limitation clause in the Contract or remit the district court's award of past pain and suffering from $800,000 to $50,0000 for a total award of $113,962.63 ($53,801.99 [economic damages] + $50,000 [past non-economic damages] + $10,160.64 [prejudgment interest]).[8]

Respectfully Submitted,

/s/ Jack R. Reiter
Jack R. Reiter
Florida Bar No.: 0028304
jack.reiter@gray-robinson.com
Robert C. Weill, Esq.
Florida Bar No.: 0009962
robert.weill@gray-robinson.com
GrayRobinson, P.A.
333 SE Second Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

*Counsel for Appellant/Cross-Appellee NCL*

---

[8] The prejudgment interest calculation mirrors the district court's calculation in the amended final judgment. *See* DE 179 at 2 n.1.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I certify that this brief complies with the type-volume limitation in FRAP 32(a)(7). This brief contains <u>12,868</u> words.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Principal Brief was filed with the Clerk of Court using the CM/ECF system this 28th day of October 2024, which will serve a copy on all counsel of record.

<u>/s/ Jack R. Reiter</u>